# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ARTUK, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 3811 |
| v. | ) | |
| | ) | **Magistrate Judge** |
| AKT Corp. et al, | ) | **Maria Valdez** |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

This matter has been referred to this Court for a Report and Recommendation on Defendants AKT Corporation and Franz Schoenecker's Motion for an Order on Motion to Enforce Settlement Agreement and Attorneys' Fees and Costs [Doc. No. 33]. For the reasons that follow, this Court respectfully recommends that the district court grant Defendants' motion.

## BACKGROUND

Defendant Franz Schoenecker, owner of Defendant AKT Corporation, has filed a Motion to Enforce Settlement Agreement [Doc. Nos. 33]. The motion contends that Schoenecker entered into an enforceable settlement agreement with Plaintiff Arthur Schueler. Schoenecker asserts that he and Schueler arrived at binding terms of settlement on two separate occasions, first on September 4, 2013 following private mediation, and again on October 2, 2013 after an in-chambers settlement conference with this Court.

Schoenecker argues that on October 2, the parties reached a binding settlement agreement, which they reported to the Court and was memorialized in a minute entry stating that the parties "reach[ed] terms of settlement," and directing the parties to file a stipulation with the district court [Doc. No. 24]. He asserts that under the material terms of that agreement, Schueler would purchase Schoenecker's stake in Artuk, Inc. — a business they have to this point run as equal partners — in exchange for $600,000, a six-month paid consulting position at Artuk, and a full release of the claims against Schoenecker in this lawsuit. Although Schoenecker admits that the parties left the October 1 settlement conference with outstanding differences regarding the language of a noncompete agreement, he claims that e-mails exchanged by the parties in mid-October resolved whatever disagreement remained.

A.     **Artuk and AKT**

Schoenecker and Schueler are equal shareholders, officers, and directors of Artuk, Inc. ("Artuk"). Artuk sells plastic reflective devices for concrete walls, guardrails, and barrier walls, which are typically used on roadways and construction sites. The majority of Artuk's customers are government contractors. Upon formation of Artuk, Schoenecker and Schueler agreed to split profits from the company equally and they are both fifty percent shareholders in the business.

In addition to Artuk, Schoenecker and Schueler each own separate businesses, both of which market reflective safety devices. Schoenecker's company, AKT, Inc. ("AKT") primarily sells metal-backed plastic reflective devices. Schueler's company, Plastic Technologies Inc. ("PTI") manufactures many of plastic devices sold by Artuk. Prior to the commencement of this lawsuit, the co-owners' responsibilities were neatly split: Schoenecker was responsible for marketing and sales, including obtaining purchase orders and executing agreements necessary to complete deals with customers, while Schueler was primarily responsible for fabrication of Artuk products through PTI. Schueler also managed Artuk's financial information, paperwork, and general ledger.

Artuk's customers have historically ordered products in two ways. Some customers simply purchased directly from Artuk. However, a second category of customers purchased Artuk products through AKT, placing their orders with Schoenecker, who would in turn submit a separate purchase order to Artuk. Artuk would then invoice AKT and AKT would invoice the customer. In this capacity, AKT acted as a distributor for Artuk products.

Legal troubles between Schoenecker and Schueler began when Schueler filed the present suit in Illinois State Court, alleging that Schoenecker was diverting profits from Artuk to AKT by providing customers with invoices for products which reflected a greater price than the invoices that were sent to Artuk. Schoenecker has subsequently removed the case to federal court pursuant to 28 U.S.C. § 1441(b) and

filed a counterclaim, accusing Schueler of a breach of fiduciary duty for diverting profits from Artuk into PTI. The case has been consistently marred by acrimony between the parties, frequent accusations of newly discovered wrongdoing, and, most notably, the formation and subsequent collapse of settlement agreements.

### B.    Litigation and Settlement Negotiations

Since the lawsuit was originally filed in state court, the parties have engaged in multiple rounds of discussions that have produced apparent settlement agreements, yet none of them seem to have stuck. On August 23, 2013, the parties engaged in private mediation with retired Wisconsin Supreme Court Justice Janine Geske. The mediation ended without a settlement agreement in place, but the parties continued negotiations via e-mail in the following weeks. On September 4, 2013, Schueler's attorney sent an e-mail with a "final offer" to pay $600,000 for Schoenecker's interest in Artuk, plus $50,000 for Schoenecker to provide "consulting services" through February, 2014. (Doc. No. 17, Ex. A.) Schueler's attorney at the time, Mario Karayannis, ended the essential terms of his offer with a note that "[i]f we can agree on a purchase price, I would assume we would be able to agree upon suitable language for noncompete agreements, etc." (*Id*.) The parties exchanged two more e-mails discussing counteroffers and modifying small terms, with Schueler holding firm to a $600,000 purchase price for Schoenecker's stake in Artuk. (Doc. No. 17, Exs. B, C.) On September 6, 2013, Schoenecker's counsel, Mark Malloy, e-mailed Karayannis, accepting the offer at $600,000 and the consulting agreement. (Doc. No.

17, Ex. D. ) Schueler's counsel responded the same day to confirm Schoenecker's

acceptance of the offer. (Doc. No. 17, Ex. E.) In spite of this exchange, Schueler

expressed reservations about the settlement and the sale was never finalized by the

parties.

On September 27, 2013, Schoenecker filed a Motion to Enforce Settlement in

an effort to enforce agreements allegedly reached via e-mails between the parties.

(*See* Doc. No. 16.)[1] Schoenecker asserted that the September 4, 2013 e-mail from

Schueler's attorney conveyed a "final offer " to settle the case by purchasing

Schoenecker's interest in Artuk for $600,000, which he accepted. The September 27

Motion to Enforce Settlement was referred to this Court on October 1, 2013. On the

same day, the parties appeared before this Court to conduct another round of

settlement discussions, where the terms of the previous settlement offer were altered.

The parties left the Court without having reached a resolution. On October 2, the

parties separately advised the Court via telephone that a settlement had been

---

[1] On September 27, 2013, Schoenecker also filed a motion for an Order on Motion to
Appoint Receiver and Motion For Preliminary Injunction and for Attorneys' Fees and
Costs [Doc. No. 32; *see also* Doc. 75], alleging that Schueler is engaging in a pattern of
conduct which both undermines Schoenecker's decision-making power as a fifty percent
partner in Artuk and harms the business. In briefing the Motion to Appoint Receiver,
Schoenecker has represented that "if the Motion to Enforce Settlement is granted, [the
Motion to Appoint Receiver] becomes moot." (Def.'s Reply Br. in Supp. of Mot. for Order
Appointing Receiver and Mot. for Prelim. Inj. 1.) This Court agrees. In the event that
Schueler takes full control of Artuk, issues concerning Schoenecker's ability to control
the company are irrelevant and do not require further analysis. This Court respectfully
recommends that the Motion to Appoint Receiver be denied as moot, consistent with the
findings set forth in this report and recommendation.

reached, and the district court noted the settlement in a minute entry. (*See* Doc. No. 23.) Then, on October 25, new counsel for Schueler, Ronald Boorstien, filed an appearance. Malloy wrote the district court on November 1 to advise that Schueler had pulled out of the October 2 settlement [Doc. No. 28]. Karayannis filed an opposed motion to withdraw soon after, which was granted by the district court.

The parties, including Schueler's new counsel, held a final settlement conference before this Court on January 29, 2014, but could not come a resolution. As a result, this Court proceeded to hold three evidentiary hearings on March 17, April 4, and April 7, 2014. During those hearings the Court heard testimony from Schoenecker, Schueler, and Karayannis — who testified pursuant to Schueler's waiver of the attorney-client privilege with respect to settlement communications — about what took place during settlement negotiations and whether a settlement was reached. Schoenecker's wife, Debbie, and Schueler's son, Gregg, also testified regarding changes to Artuk's operations that have taken place since litigation commenced.

While Schoenecker's first motion sought to enforce the September 4 settlement [Doc. No. 16], his counsel subsequently suggested to this Court that he intends to seek enforcement of the alleged October settlement during a February 12, 2014 hearing on Schoenecker's motion to enforce. (*See* Tr. 343:3–6) ("At this point, the agreement we're going to ask to be enforced is the October 15th settlement — or the October 2nd settlement agreement that was reported to Judge Holderman.") The

Court will therefore focus its analysis on whether an enforceable agreement was reached pursuant to the parties' report of settlement to this Court and subsequent communications between the parties.

## DISCUSSION

I.   **LEGAL STANDARD**

A settlement agreement is a contract governed by ordinary construction principles under state law. *Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 618 (7th Cir. 2008); *Pohl v. United Airlines, Inc.*, 793 F.2d 858, 862 (7th Cir. 2000). "Under Illinois law an oral settlement agreement is enforceable if 'there clearly is offer, acceptance and a meeting of the minds as to the terms.'"*TRT Transp., Inc. v. Aksoy*, 506, F. App'x. 511, 513 (7th Cir. 2013) (quoting *Lewis v. Sch. Dist. #70*, 648 F.3d 484, 486 (7th Cir. 2011)). It is not necessary for the "meeting of the minds" to encompass every element of a settlement agreement, but it should reflect an agreement on "all material terms." *Highbee v. Century Ins. Co.*, 253 F.3d 994, 997 (7th Cir. 2001). Whether a meeting of the minds has occurred depends on the objective conduct of the parties, rather than their subjective beliefs. *Dillard v. Starcon Intl., Inc.,* 483 F.3d 502, 507(7th Cir. 2007).

"As a general rule, anticipation of a more formal future writing does not nullify an otherwise binding agreement." *Abbott Labs v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999). Where a writing is not expressly made a condition

precedent to bind the parties to a settlement agreement, disputes over the language

of a written document will not render the oral agreement unenforceable. *Dillard.,* 483

F.3d at 508–09 ("Continued negotiations may indicate a lack of agreement on

material settlement terms, but not necessarily so."). In cases where ancillary matters

are missing or left to be agreed upon at a later date, Illinois courts have held that the

material terms underpinning the settlement agreements will still be enforceable. *See*

*Dawson v. General Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992); *Academy Chicago*

*Publishers v. Cheever*, 144 Ill. 2d, 161 Ill Dec. 335, 578 N.E.2d 981, 984 (Ill. 1991).


## II.    ANALYSIS

### A.    Offer, Acceptance and Meeting of the Minds on the Settlement Agreement

The parties are in agreement that an offer to settle the case was conveyed,

accepted, and reported to the Court in early October, 2013. However, Schueler

suggests that Karayannis was not authorized to settle the case on his behalf and that

any reported agreement is therefore unenforceable. In Illinois, an attorney is only

authorized to settle a case on behalf of a client if the client gives the attorney express

authority to do so. *Magallanes v. Illinois Bell Tel. Co.*, 535 F.3d 582, 584 (7th Cir.

2008). As Schueler's current counsel admits, the fact that offers were made and

negotiated in Schueler's presence during the course of a settlement conference before

this Court evinces that Karayannis had authority to act on Schueler's behalf:

> The Court: Would you agree that a representation that [Karayannis] made in Mr. Schueler's presence to this Court would be a binding representation on behalf of Mr. Schueler?
>
> Boorstein: Depending on what the representation is. You can't just say that any representation would be. I think it has — it has greatly to do with what the representation is.
>
> The Court: Well, you would admit Mr. Schueler would have an obligation to say, "Hey, wait a minute. No, no, no, he can't say that. That is not what I agreed to"? Would you agree there that there would be some obligation to say something?
>
> Boorstein: I would — I would think, yes. I have to acknowledge that if he hears something being said that he doesn't agree with, that he should at that time speak up. But I don't think that that creates an obligation on his part to accept what the other side has offered.

(Tr. 415:18–416:16.) "[W]here a party silently stands by and permits her attorney to act in her behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority as to third persons." *Szymokowski v. Szymkowski*, 104 Ill. App. 3d 630, 60 Ill. Dec. 310, 432 N.E.2d 1209, 1211 (Ill. App. 1982). Here, Schueler stood by in the presence of this Court as the terms of settlement were negotiated, and did not give any indication that Karayannis lacked authority to speak on his behalf. Furthermore, the Court credits Karayannis's testimony that he was authorized to accept the terms of a settlement and report them to this Court on October 2:

> Malloy: Did you have authority to represent to Judge Valdez on October 2nd, 2013 that your client had reached a settlement with Mr. Schoenecker?

> Karayannis: I believe so. We had discussed a lot of the additional terms on October 1st. We had made a lot of phone calls on October 2nd between myself yourself, myself and my client, presumably you and your client. And as of 4:00 p.m. or thereabout-ish when Judge Valdez had contacted us, my understanding was that the global terms had been arrived at.

(Tr. 374:4–12.) In the absence of evidence to the contrary, Karayannis's testimony adequately demonstrates that he had authority to settle the case and report that settlement to the Court. *See Maxey v. Monahan*, 478 F. Supp. 2d 1044, 1050–51 (N.D. Ill. 2007) (crediting plaintiff's attorney's statement that defendant's attorney informed him of being authorized to settle the case and concluding that "[i]t is of no moment that [defendant's] insurance provider and senior counsel sought to second-guess the deal *after* it was made") (emphasis in original).

Because this Court has found that Karayannis had authority to settle the case on Schueler's behalf, the operative question becomes whether there was an offer and acceptance of the material terms of the settlement agreement. Here, testimony from the parties and Schueler's former counsel indicates that the parties did come to an agreement as to the essential terms of a binding settlement. Karayannis testified that the major elements of the settlement framework established during the October 1 conference were a $600,000 purchase price for Schoenecker's share of Artuk and a six-month paid consulting agreement for Schoenecker.(Tr. 360:13–25). The parties additionally resolved to extend a previously negotiated three-year noncompete agreement to five years, (*id*,) and agreed that the settlement would result in a dismissal of the lawsuit. (Tr. 361:6–9.) E-mails exchanged by the parties on October 7

and a written copy of the terms of the settlement sent from Malloy to Karayannis on October 15 further show that those terms had been agreed to by the parties. (*See* Def..'s Reply Br. in Supp. of Mot. to Enforce Settlement, Exs. D, E.) "Under Illinois law '[a] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995) (quoting *Chicago Academy Publishers*, 578 N.E.2d at 983). Here, there is no question that the settlement provided for the sale of one half of Artuk from Schoenecker to Schueler, a consulting period for Schoenecker, a noncompete agreement, and a release of claims.

A meeting of the minds between the parties was demonstrated by the agreement to the essential terms of the contract reported to the Court on October 2. Schueler also indicated his intent to be bound by taking steps to perform the contract, including beginning to "transition" Artuk from joint ownership to individual control. During the last weeks of October, Schueler engaged in a variety of activities showing his preparation to take sole ownership of Artuk, presumably after purchasing Schoenecker's stake in the business. Indeed, following the October 2 report of settlement, Schueler installed his son Gregg as the "sales manager" of Artuk (the position formerly held by Schoenecker), (Def.'s Ex. 30,); established a new phone number and a website that does not mention Schoenecker, (Def.'s Ex. 29,); and drafted customer e-mails discussing Schoenecker's removal from Artuk operations

and pointing to Gregg Schueler as the person available for "all . . . future needs" of Artuk's customer base. (Def.'s Ex. 39.) Schueler's steps to take control of the business were further substantiated by testimony regarding the transition period from his son Gregg at the evidentiary hearing:

> Malloy: But then if you look at Exhibit 27, that's an e-mail you sent to a company called — to Nicky Bloom at Big Green Signs in Dublin, Georgia, correct?

> Gregg Schueler: Correct. This is a company that had contacted us when we were supposed to be transitioning. When I was helping them transition —

> . . .

> Malloy: Helping who transition?

> Gregg Schueler: Artuk and me and Tucker working together to transition customers. Because customers were calling our — in Elgin, our office in Elgin.

> Malloy: So in October of 2013 you were working with Mr. Schoenecker to transition customers from AKT customers to Artuk customers?

> Gregg Schueler: From Tucker to our — Tucker's office to our office.

(Tr. 345:6–21.) Under the objective theory of intent used in Illinois contract law, a meeting of the minds is not determined by the subjective intent of a party, their "secret hopes and wishes," but is instead shown by what they express "to each other and to the world." *Laserage Tech. Corp. v. Laserage Labs, Inc.*, 972 F2d 799, 802 (7th Cir. 1992); *see also Allstate Fin. Corp. v. Util. Trailer of Ill., Inc.* 936 F. Supp. 525, 528 (N.D. Ill. 1996) ("Illinois law states that ordinary contract construction rules apply to

a settlement agreement: the court looks to the parties' conduct in determining their intention to be bound to the terms of the agreement."). Schueler's objective actions demonstrate a meeting of the minds as to the terms of the settlement agreement. Those action overwhelm any private apprehension or misgivings he may have expressed in justifying his refusal to abide by the terms of the settlement agreement.

Based on the October 1 in-chambers settlement negotiations, the parties' report that a settlement was reached, and Schueler's activities in furtherance of the settlement, this Court finds that a meeting of the minds clearly occurred as to the material terms of the settlement agreement. Thus, the only remaining question is the agreement's enforceability.

### B.    Enforceability of Oral Agreement

Schueler's argues that the October 2013 settlement is unenforceable because the relevant parties did not sign a written agreement. The argument is unpersuasive. Under Illinois law, orally agreed to settlements are enforceable so long as a court "can ascertain the parties' agreement from the stated terms and provisions." *Dillard*, 483 F.3d 502 at 507; *see also Taylor v. Gordon Felsch Co.*, 793 F.2d 858, 862 (7th Cir. 1986). It is also clear that the oral agreement of the parties was not contingent on any future writings, as neither party conveyed as much to this Court or to the district court:

Defendant's Counsel: You never informed Judge Valdez on Octo[b]er 1st or October 2nd that execution of settlement documents was a prerequisite to settlement, is that fair?

Karayannis: I didn't say those explicit words, no.

(Tr. 375 at 374:24–375:2.) Without affirmative evidence that the parties' agreement would take effect only upon the execution of a written document, Schueler's assertion that a signed writing was never produced is of little significance in this case. *See Starcon Intl.,* 483 F.3d at 508–09. Thus, the Court need only establish that the parties reached an enforceable oral agreement.

Schueler cites only one binding authority in support of his contention that the oral agreement between the parties is unenforceable because they did not personally acknowledge that they had a meeting of the minds, *Magallanes v. SBC*, 472 F.3d 923 (7th Cir. 2006). In that case, the Seventh Circuit found that the party seeking to enforce a settlement which was allegedly entered into out of court had produced "no evidence that Magallenes knowingly and voluntarily consented to a settlement; there was no evidence that Magallenes had authorized Goldman to settle under any terms; and there was no evidence as to any settlement terms." *Id*. at 924. Here, there is ample evidence of settlement terms with several submissions that concern rounds of negotiation, in addition to testimony from Schueler's prior counsel stating that he discussed the terms of an overall deal with his client and had authority to

accept a settlement offer. More importantly, Mr. Schueler appeared before this Court for settlement discussions and later took steps to actualize the terms of the agreement that was discussed during the that conference.

At the October 1 settlement conference, the parties approached a resolution resembling a final settlement agreement. A day later, the parties called and informed the Court that they were satisfied with the terms of the agreement laid out in the conference and that the matter was settled, with some minor details that needed to be resolved and laid out in writing. This Court finds that the terms stated orally by the parties were not conditioned on a future writing, and that those terms were sufficiently definitive to be enforceable. Thus, the absence of a written document that was signed by the parties is no impediment to a court's enforcement of the October settlement.[2]

---

[2] As a final note on enforceability, statements by Schueler's counsel during the evidentiary hearing and portions of his brief in opposition to the motion to enforce settlement hint that he believes the oral agreement reached between the parties is not enforceable as a violation of the Statute of Frauds, though this argument was never made explicit. Regardless, Illinois courts have held that a signed writing is unnecessary where proceedings are held before a judge, obviating the need for a signature to authenticate the agreement. *Rose v. Mavrakis* 343 Ill.App.3d 1086, 278 Ill.Dec. 751, 799 N.E.2d 469, 478 (Ill. App. 3d 2003) ("When parties reach a settlement agreement during a court-mandated settlement conference conducted in the judge's chambers and state the terms of that agreement in the judge's presence, there is no danger of enforcement of a contract which was, in fact, never made."). Hence, the length of the noncompete agreement does not mean that is unenforceable without a signed writing, as that term was agreed to in the presence of this Court.

### C.    Noncompete Agreement

Schueler's final argument is that there can be no enforceable settlement because the parties were not in agreement on the language of the five-year noncompete agreement. More specifically, Schueler was uncomfortable with the noncompete agreement, although he did not make this clear to Karayannis until after the settlement was reported on October 2:

> Defendant's Counsel: After you were informed on or about October 2nd, 2013, that Mr. Karyannis had reported the conv — this settlement to Judge Valdez, did you inform Mr. Karayannis that he had no authority to make that representation?
>
> Schueler: I didn't inform him of that, but I did tell him I did not like the non-compete still.
>
> Defendant's Counsel: When did you tell Mr. Karayannis that?
>
> Schueler: Soon after.
>
> . . .
>
> Defendant's Counsel: Soon after the conversation where he reported to Judge Valdez that —
>
> Schueler: After the first meeting, and after the second meeting on the telephone.

(Tr. 266:10–23.) In fact, Schueler did not openly express his dissatisfaction with the noncompete negotiated by Karayannis and Malloy until late October 28, when Boorstein sent a new, unanticipated noncompete to Malloy. (*See* Def.'s Reply Br. in Support of Mot. to Enforce Settlement, Ex. G.)

This case is a good example of the longstanding rule in the Seventh Circuit that "a party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement is insufficient." *Taylor*, 793 F.2d at 863; *see also Glass v. Rock Island Refining Corp*, 788 F.2d 450, 454–55 (7th Cir. 1986). Thus, "[t]he fact that parties le[ave] some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." *Porter v. Chi. Bd. of Educ.*, 981 F.Supp 1129, 1131 n.4 (N.D. Ill. 1997). Additionally, "Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or 'incomplete' agreements." *Dawson v. Gen. Motors Corp.*, 766 F.2d at 374 (internal citations omitted).

Since reporting the settlement on October 2, Schueler has been concerned with the possibility that Schoenecker intends to pursue customers for AKT, customers that he thinks should rightfully be doing business with Artuk. Schueler believes this alleged misconduct by Schoenecker shows that no noncompete agreement was ever reached and thus no settlement exists.[3] The parties' exchanges during the October 1

---

[3] In addition to briefings opposing the present motion on the basis of alleged wrongdoing by Schoenecker, Schueler filed a Motion for an Accounting and Turn Over Order [98] on May 1, 2014. The motion requests that Schoenecker account for and deliver to Schueler all monies that he allegedly owes to Schueler as a result of withholding customer payments that should have been remitted to Artuk. The motion is odd insofar as it requests relief that is almost identical to what is requested in Schueler's original complaint. A ruling in favor of enforcing the settlement moots the concerns raised in Schueler's Motion for an Accounting and Turn Over Order in the same way that it moots Plaintiff's Motion to Appoint Receiver. Upon paying Schoenecker for his stake in Artuk, Schueler would have full control of the business and forfeits any and all claims associated with this lawsuit, including his redundant request for what he believes to be

in-court settlement conference, the October 2 report of settlement, Karayannis's testimony that an agreement was reached, and Schueler's conduct all suggest that an agreement to a five-year noncompete — in addition to the other terms of the settlement — was reached by the parties. Furthermore, e-mails exchanged between Karayannis and Malloy on October 7 and October 15 regarding small changes to the language of the noncompete agreement showcase an agreement to the noncompete as a major term of the settlement, with small adjustments being made to suit the needs of both parties. (Def.'s Exs. 19, 20.) Thus, Schueler's assessment of Schoenecker's alleged violations of the noncompete has it backwards; if Schoenecker is indeed violating the terms of the noncompete, Schueler's remedy would be to *sue for violation of the settlement agreement*. Schueler's desires to tweak the language of the noncompete agreement through new counsel in order to better reflect his desired outcomes cannot be used to obstruct a settlement which both parties agreed to.

Finally, the mismatch between the parties' understandings of the details of the noncompete does not overwhelm the remaining material terms of the settlement agreement, namely, the essential question of the sale price of Artuk. Under Illinois law, settlement agreements have been enforced when the parties agree on the amount to be paid, even if other terms have not be agreed upon. *See, e.g. Wilson*, 46 F.3d at 667 (oral agreement enforceable despite absence of agreement as to mutual

wrongfully withheld funds. Hence, this Court respectfully recommends that Schueler's Motion for an Accounting and Turn Over Order be denied as moot.

releases or covenants not to sue); *Flood v. Ty, Inc.*, No. 02 C 9497, 2005 WL 994579 (N.D. Ill. Apr. 5, 2005) (oral settlement agreement enforceable notwithstanding subsequently raised concerns with confidentiality and release of attorney's lien). To the extent that Schueler relies on *Higbee v. Sentry Insurance Co.*, 253 F.3d 994 (7th Cir. 2001) for the proposition that the parties' total accord on the noncompete is essential to the enforceability of the settlement agreement as a material term, the Seventh Circuit has previously highlighted the features of that case which distinguish it from the present matter:

> Dillard's reliance on [*Higbee*] is also misplaced; he sweeps away critical factual differences between that case and this one. Dillard asserts that *Higbee* expressly held that confidentiality clauses, nondisparagement clauses, and release provisions are objectively material terms. *Higbee* does not so hold. The plaintiff in *Higbee* made clear during negotiations that she would not settle until the parties hammered out confidentiality and nondisparagement clauses. The materiality of these terms was never in doubt. This court's decision in *Higbee* did note that many defendants would consider these terms to be among the most material in a settlement agreement. This observation, however, was a generalization; *Higbee* does not stand for the proposition that these provisions are material as a matter of law.

*Dillard* 483 F.3d 502 at 508–09. In this case, as in *Dillard*, the fine points of the noncompete were never made a condition precedent to a settlement agreement. The simple fact that those details were important to Schueler's comfort with settling the case is insufficient to scuttle the material terms on which the parties settled.

## <u>CONCLUSION</u>

For the reasons stated above, the Court respectfully recommends that the district judge grant Defendant's Motion to Enforce Settlement [Doc. No. 33], and order the parties to fulfill their obligations under the October 2, 2013 settlement agreement, containing the following material terms: (1) Schueler will purchase Schoenecker's stake in Artuk for the purchase price of $600,000; (2) Schoenecker will be retained with as a consultant to Artuk for six months from the date of closing on the Artuk purchase and be paid $50,000 for his services; (3) the parties will enter into a five-year noncompete agreement, consistent with the terms reached between Malloy and Karyannis in e-mail correspondence from October 2 to October 15, 2013 (*see* Def.'s Ex. 15–21,); (4) the parties will release any and all claims associated with this lawsuit. Upon full payment, the Court recommends that the case be dismissed with prejudice and with each side to bear its own attorneys' fees and costs. Specific written objections to this report and recommendation may be served and filed within 14 days from the date that this order is served. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).

**SO ORDERED.**                    **ENTERED:**

**DATE:**    June 6, 2014

**HON. MARIA VALDEZ**
**United States Magistrate Judge**