IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTUK, INC., ARTHUR P. SCHUELER, and PLASTIC TECHNOLOGIES, INC., | ) ) ) |
| Plaintiffs and Counterdefendants, | ) ) |
| v. | ) ) ) No. 13 C 3811 |
| AKT CORPORATION and FRANZ SCHOENECKER, | ) ) ) |
| Defendants and Counterplaintiffs. | ) ) ) |

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION [114]

JAMES F. HOLDERMAN, District Judge:

The court overrules Plaintiffs' objections and, after considering the parties' respective presentations, adopts Magistrate Judge Valdez's June 6, 2014 Report and Recommendation (Dkt. No. 114) in its entirety. Defendants' amended motion to enforce the settlement agreement (Dkt. No. 31) is granted.

The parties are ordered to fulfill their obligations under the October 2, 2013 settlement agreement, which include the following: (1) Schueler shall purchase Schoenecker's stake in Artuk for the price of $600,000; (2) Artuk shall retain Schoenecker as a consultant for six months from the date of Schueler's purchase of Artuk and Artuk shall pay Schoenecker $50,000 for his consulting services; (3) the parties shall enter into a five-year non-compete agreement consistent with the terms reached on October 2, 2013 and set forth in email correspondence between Mark Malloy and Marios Karayannis between October 7, 2013 and October 15, 2013

(Dkt. No. 34 Exs. A, B, C; Dkt. No. 58 Ex. C)[1]; and (4) the parties shall release any and all claims associated with this lawsuit. Defendants' motion to appoint receiver and motion for preliminary injunction and for attorneys' fees and costs (Dkt. No. 32) and Plaintiffs' motion for an accounting and turnover order (Dkt. No. 98) are denied as moot. This case is dismissed with prejudice.

STATEMENT

Before the court are Plaintiffs' objections to Judge Valdez's Report and Recommendation (Dkt. No. 114 ("R&R")) addressing Defendants' Amended Notice of Motion and Motion to Enforce Settlement Agreement."[2] (Dkt. No. 31). On June 6, 2014, Judge Valdez recommended that the court grant Defendants' motion.[3] On June 19, 2014, Plaintiffs objected to Judge Valdez's Report and Recommendation as provided by Federal Rule of Civil Procedure 72(b)(2) and 28 U.S.C. § 636(b)(1)(C). (Dkt. No. 115.) On July 1, 2014, Defendants filed a response in opposition to Plaintiffs' objections. (Dkt. No. 116.) On July 15, 2014, although not expressly

---

[1] Defendants have filed copies of the same email correspondence with nearly every submission to the court. The correspondence first appears in a declaration (Dkt. No. 34) filed in support of Defendants' amended motion to enforce the settlement. The attachments to that email correspondence, including a draft non-compete agreement, first appear as an exhibit to Defendants' reply in support of their motion to enforce. (Dkt. No. 58 Ex. C.)

[2] Defendants' initially filed a motion to enforce a settlement reached on September 4, 2013. (Dkt. No. 16.) After filing that motion, the parties reached another settlement on October 2, 2013, (Dkt. No. 23), which Plaintiffs again repudiated. Although it is not clear from the face of Defendants' amended motion, (Dkt. No. 31), which purports to renew Defendants' first motion to enforce, Defendants now seek to enforce the second settlement reached on October 2, 2013. (*See* R&R at 6 (discussing Defendants' motions)).

[3] Judge Valdez recommended granting the motion appearing at docket number 33, which is a proposed order—incorrectly filed on the docket—granting Defendants' motion to enforce the settlement. Defendants' motion appears at docket number 31, although it is incorrectly captioned as a notice of motion. Both parties' use of this district's electronic filing system has been less than exemplary. The court therefore encourages attorneys for both sides to attend a CM/ECF training seminar, which are offered without cost on a regular basis at 219 South Dearborn Street, Chicago, IL 60604.

permitted under Rule 72(b), Plaintiffs filed a reply brief. (Dkt. No. 117.) The court has considered all of the parties' filings and, for the following reasons, the court adopts Judge Valdez's Report and Recommendation in its entirety. Because the settlement agreement reached on October 2, 2013 controls the parties' dispute and is a valid, enforceable contract under Illinois law, the court grants Defendants' amended motion to enforce the settlement agreement.

STANDARD OF REVIEW

"When a magistrate judge prepares a report and recommendation for a district court, the governing statute provides that the district court 'shall make a de novo determination' with respect to any contested matter." *Kanter* v. *C.I.R.*, 590 F.3d 410, 416 (7th Cir. 2009) (citing 28 U.S.C. § 636(b)(1)(C)). According to the Seventh Circuit:

> *De novo* review requires the district judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion. The district judge is free, and encouraged, to consider all of the available information about the case when making this independent decision. A district judge may be persuaded by the reasoning of a magistrate judge or a special master while still engaging in an independent decision-making process.

*Mendez* v. *Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013) (citing *United States* v. *Raddatz*, 447 U.S. 667, 676 (1980)). "The magistrate judge's recommendation on a dispositive matter is not a final order, and the district judge makes the ultimate decision to adopt, reject, or modify it." *Schur* v. *L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009).

BACKGROUND

An in-depth discussion of the facts underlying the lawsuit can be found in Magistrate Judge Valdez's Recommendation and Report. (R&R at 1-6.) Rather than reciting the facts at length here, the court repeats only those facts relevant to the issue before the court, which is whether the parties entered into an enforceable settlement agreement on October 2, 2013. The parties are Franz Schoenecker ("Schoenecker"), Arthur Schueler ("Schueler"), Artuk, Inc.

("Artuk"), AKT Corporation ("AKT"), and Plastic Technologies, Inc. ("PTI"). Schoenecker and Schueler are equal shareholders, officers, and directors of Artuk, which is a joint venture formed to sell plastic reflective devices. Schoenecker and Schueler each own separate business, AKT and PTI, which also manufacture and sell a variety of reflective devices. Schoenecker and Schueler eventually had a falling out, followed by myriad accusations of fraud and—ultimately—this lawsuit. For the sake of clarity, the court will refer to Schueler, PTI, and Artuk as "Plaintiffs" and Schoenecker and AKT as "Defendants."

As Judge Valdez noted in her Report and Recommendation, the parties have reached an apparent settlement on several occasions but cannot seem to cross the finish line. On August 23, 2013, the parties participated in a private mediation with retired Wisconsin Supreme Court Justice Janine Geske. (R&R at 4.) Although the mediation ended without an agreement, the parties continued to talk over email during the following weeks. (*Id.*) On September 4, 2013, Plaintiffs' attorney Marios Karayannis ("Karayannis") sent Defendants' attorney Mark Malloy ("Malloy") an email with a "final offer" to pay $600,000 for Schoenecker's interest in Artuk, plus $50,000 for Schoenecker to provide "consulting services" during the six months following the sale. (*Id.*; Dkt. No. 17 Ex. A.) Karayannis ended his September 4 email with a note that "[i]if we can agree on a purchase price, I would assume we would be able to agree upon suitable language for non-compete agreements, etc." (*Id.*) On September 6, 2013, after exchanging two more emails discussing counteroffers and minor terms, Malloy emailed Karayannis to accept the offer of $600,000 for Schoenecker's interest in Artuk and $50,000 for the six month consulting agreement (the "September 6 Settlement"). (R&R at 4-5; Dkt. No. 17 Ex. D.) Karayannis responded the same day to confirm Defendants' acceptance of the offer, (R&R at 5; Dkt. No. 17

Ex. E), and on September 19, 2013, Malloy and Karayannis appeared before this court and reported that they had reached a settlement. (Dkt. No. 14.)

On September 27, 2013, after Plaintiffs refused to close the deal, Defendants filed a motion to enforce the September 6 Settlement. (Dkt. No. 16.) On October 1, 2013, although Defendants' motion remained pending, the parties participated in a further round of settlement discussions with Judge Valdez. (Dkt. No. 22.) The parties made progress but left the settlement conference without an agreement. The next day, however, counsel for Plaintiffs and Defendants separately telephoned Judge Valdez's chambers to advise the court that they had resolved their differences and reached a settlement agreement. (Dkt. Nos. 23, 24.) The major terms of the October 2, 2013 settlement, which differed slightly from the previous settlements, were as follows: (1) Schueler agreed to purchase Schoenecker's interest in Artuk for $600,000; (2) Artuk agreed to retain Schoenecker as a consultant for six months after the sale and pay him $50,000 in monthly installments; (3) the parties agreed to extend a non-compete agreement, which they had discussed the day before, from three years to five years; and (4) the parties agreed to release all claims and dismiss the current lawsuit (the "October 2 Settlement"). (R&R at 10; Tr. 360:13-25, 361:1-9.)[4]

Over the next two weeks, Malloy and Karayannis exchanged proposed language and drafts as they attempted to reduce their oral settlement agreement to writing. (R&R at 11; Dkt. No. 58 Exs. B-F.) On October 15, 2013, Malloy sent Karayannis revised versions of the settlement documents, including the five-year non-compete agreement (the "October 15 Non-Compete"). (Dkt. No. 58 Ex. F.) According to Malloy's email, the revised documents reflected

---

4    Although the transcript of the evidentiary hearing before Judge Valdez appears at four different docket entries, (Dkt. Nos. 72, 76, 86, 110), the transcript is paginated consecutively across the docket entries. The court will therefore cite the aggregate transcript as "Tr." and use the native pagination, rather than the page numbers generated by CM/ECF.

Karayannis's edits as of October 15, 2013. (*Id.*) On October 16, 2013, Malloy and Karayannis jointly contacted the court to request that the October 17, 2013 status date be postponed until after the deal closed on October 31, 2013. On October 17, without explanation, Karayannis stopped replying to emails. Between October 17 and October 24, Malloy sent Karayannis a number emails seeking information about the settlement documents and the logistics for the closing, but received no response. (Dkt. No. 34 Exs. D, E, F.) On October 25, 2013, Ronald Boorstein ("Boorstein") filed an appearance on behalf of Plaintiffs (Dkt. No. 26) and telephoned Malloy to relay that he was replacing Karayannis and had concerns with "one area of the closing documents." (Dkt. No. 34 ¶ 14.) Boorstein subsequently emailed Malloy a document titled "Noncompetition Provisions," which Boorstein stated would "create the complete and effective separation in accordance with the intentions of the parties and specify appropriate damages for any breach or violations of them." (Dkt. No. 34 Ex. H.) Boorstein's revised non-compete agreement did not resemble the October 15 Non-Compete and did not reflect the terms Malloy and Karayannis agreed to as part of the October 2 Settlement. Consequently, on November 1, 2013, Malloy filed a letter stating that Plaintiffs had backed out of the October 2 Settlement. (Dkt. No. 30.) Malloy also filed an amended motion to enforce the October 2 Settlement. (Dkt. No. 31.)

On January 29, 2014, the parties held one last settlement conference with Judge Valdez but could not reach an amicable resolution. (Dkt. No. 64.) Judge Valdez thereafter conducted several days of evidentiary hearings (Dkt. Nos. 68, 73, 78, 80) on Defendants' amended motion to enforce the October 2 Settlement and heard testimony from Schoenecker, Schueler, and Karayannis—who testified only after Schueler waived his attorney-client privilege—about their

various settlement discussions.[5] (R&R at 6.) On June 6, 2014, Judge Valdez issued a Report and Recommendation granting Defendants' amended motion to enforce based on the oral settlement agreement the parties reported to the court on October 2, 2013. (R&R at 20.)

ANALYSIS

It is not clear whether the parties agree that Illinois law governs the disputed settlement agreement. Local state law, not federal law, governs the construction and enforcement of settlement. *Dillard* v. *Starcon, Int'l*, 483 F.3d 502, 506 (7th Cir. 2007). Defendants and Judge Valdez applied Illinois law. (*See* Dkt. No. 17 at 6 n.3; R&R at 7.) Plaintiffs, by contrast, cited cases from Alabama, Georgia, Mississippi, West Virginia, Alaska, New Hampshire, and California—and none from Illinois. (Dkt. No. 50-2 at 4-5.) But Plaintiffs have never argued for an alternative source of applicable law and, in any event, Karayannis testified that he and Malloy agreed that Illinois law would govern the October 2 Settlement. (Tr. 89:16-22.) The court will therefore apply Illinois law as well. *See Auto-Owners Ins. Co.* v. *Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (internal citation and quotation marks omitted).

Under Illinois law, settlement agreements are enforced like any other contract. *See In re Illinois Bell Tel. Link-up II,* 994 N.E.2d 553, 558 (Ill. App. Ct. 1st Dist. 2013) (settlement "agreements are construed and enforced under principles of contract law"). "A valid and enforceable contract requires an offer, an acceptance, and consideration." *Sheth* v. *SAB Tool Supply Co.*, 990 N.E.2d 738, 754-55 (Ill. App. Ct 1st Dist. 2013). Oral settlement agreements are enforceable if "there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Wilson* v. *Wilson*, 46 F.3d 660, 663-64 (7th Cir. 1995).

---

[5] Schoenecker's' wife, Debbie, and Schueler's son, Gregg, also testified regarding changes to Artuk's operations since Plaintiffs filed this lawsuit.

Although lack of agreement on minor, immaterial terms will not spoil an otherwise valid settlement, the agreement must reflect a "meeting of the minds" as to each material term. *Higbee* v. *Sentry*, 253 F.3d 994, 997 (7th Cir. 2001). And like any contract, the material terms must be "definite and certain." *City of Chicago* v. *Ramirez*, 852 N.E.2d 282, 297 (Ill. App. Ct. 1st Dist. 2011). Finally, "whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subject beliefs." *Dillard* v. *Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) (citations omitted).

As Judge Valdez explained in her Report and Recommendation, the parties do not dispute that "an offer to settle the case was conveyed, accepted, and reported to the court" on October 2, 2013. (R&R at 8.) The parties also agree that the major elements of the October 2 Settlement were (1) a $600,000 purchase price for Schoenecker's share of Artuk, (2) a six month paid consulting agreement for Schoenecker, (3) a five-year non-compete agreement, and (4) a release of the claims underlying this lawsuit. (*Id.* at 10.) Notwithstanding the October 2 Settlement, Plaintiffs argued before Judge Valdez that the October 2 Settlement was not enforceable because Karayannis was not authorized to settle the case, (Dkt. No. 50-2 at 5-6), because the parties did not reduce the agreement to writing, (*id.* at 5), and because the parties never agreed on the language of the "crucial" five-year non-compete agreement (*id.*). Judge Valdez rejected each of Plaintiffs' arguments and recommended granting Defendants' motion to enforce the October 2 Settlement. Judge Valdez further concluded that the October 15 Non-Compete that Malloy sent to Karayannis reflects the non-compete terms agreed to as part of the October 2 Settlement.

I. <u>Plaintiffs' Objections to Judge Valdez's Report and Recommendation</u>

Plaintiffs have filed objections to Judge Valdez's Report and Recommendation, (Dkt. No. 115), but the objections hardly qualify as the type of "specific" objections intended by Rule

Although lack of agreement on minor, immaterial terms will not spoil an otherwise valid settlement, the agreement must reflect a "meeting of the minds" as to each material term. *Higbee* v. *Sentry*, 253 F.3d 994, 997 (7th Cir. 2001). And like any contract, the material terms must be "definite and certain." *City of Chicago* v. *Ramirez*, 852 N.E.2d 282, 297 (Ill. App. Ct. 1st Dist. 2011). Finally, "whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subject beliefs." *Dillard* v. *Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) (citations omitted).

As Judge Valdez explained in her Report and Recommendation, the parties do not dispute that "an offer to settle the case was conveyed, accepted, and reported to the court" on October 2, 2013. (R&R at 8.) The parties also agree that the major elements of the October 2 Settlement were (1) a $600,000 purchase price for Schoenecker's share of Artuk, (2) a six month paid consulting agreement for Schoenecker, (3) a five-year non-compete agreement, and (4) a release of the claims underlying this lawsuit. (*Id.* at 10.) Notwithstanding the October 2 Settlement, Plaintiffs argued before Judge Valdez that the October 2 Settlement was not enforceable because Karayannis was not authorized to settle the case, (Dkt. No. 50-2 at 5-6), because the parties did not reduce the agreement to writing, (*id.* at 5), and because the parties never agreed on the language of the "crucial" five-year non-compete agreement (*id.*). Judge Valdez rejected each of Plaintiffs' arguments and recommended granting Defendants' motion to enforce the October 2 Settlement. Judge Valdez further concluded that the October 15 Non-Compete that Malloy sent to Karayannis reflects the non-compete terms agreed to as part of the October 2 Settlement.

I. <u>Plaintiffs' Objections to Judge Valdez's Report and Recommendation</u>

Plaintiffs have filed objections to Judge Valdez's Report and Recommendation, (Dkt. No. 115), but the objections hardly qualify as the type of "specific" objections intended by Rule

72(b). *See Lockert* v. *Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988) ("A district judge should not have to guess what arguments an objecting party depends on when reviewing a magistrate [judge's] report.") Plaintiffs instead focus on the litany of alleged "misrepresentations and deceptions" committed by Defendants' and their counsel in furtherance of the purported fraud at the heart of this lawsuit. (*See* Dkt. Nos. 115, 117.) Despite Plaintiff's failure to follow the specifications of Rule 72(b), the court will endeavor to address the cognizable objections, which are numbered in the Conclusion section of Plaintiffs' opening brief. Specifically, Plaintiffs argue that the October 2 Settlement agreement is unenforceable because: (1) there has been no "meeting of the minds" with respect to the non-compete agreement; (2) the October 2 Settlement agreement is "patently inequitable and unfair"; (3) the October 2 Settlement agreement contains no provision for transferring AKT customers to Artuk; and (4) Defendants are not entitled to relief pursuant to the "unclean hands" doctrine.[6] (Dkt. No. 115 at 9.)

Plaintiffs' second, third, and fourth objections all share the same deficiency: Plaintiffs did not present them to Judge Valdez. The law is clear that arguments not made before the magistrate judge are generally waived. *United States* v. *Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000); *see also Finwall* v. *City of Chicago*, 239 F.3d 504, 506 (N.D. Ill. 2006) (Manning, J.) (holding party may not raise argument for first time in an objection to magistrate judge's recommendation); *Cummins-Allison Corp.* v. *Glory, Ltd.*, No. 02 C 7008, 2003 WL 22125212, *16 (N.D. Ill. Sept. 5, 2003) (Guzman, J.) ("A court is not required to hear arguments that have not been made before a magistrate judge and any new arguments are generally considered to be waived."). The waiver rule exists for obvious reasons. First, "[s]ystematic efficiencies would be

---

[6] Plaintiffs have apparently abandoned two of the arguments they made before Judge Valdez, which were (i) that Karayannis lacked the authority to bind Schueler and (ii) that the October 2 Settlement is unenforceable because it was not formalized in a written document. (*See* Dkt. No. 115)

frustrated and the magistrate's role reduced to that of a mere dress rehearsal if a party were allowed to feint and weave at the initial hearing and save its knockout punch for the second court." *Patterson-Leitch Co.* v. *Mass. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988). Second, consideration of arguments not raised before the magistrate judge "undercut[s] the rule that the findings in a magistrate judge's report and recommendation are taken as established unless the party files objections to them." *Melgar*, 227 F.3d at 1040.

Here, neither Plaintiffs' January 2, 2014 response to Defendants' amended motion to enforce the settlement, (Dkt. No. 50-2), nor Judge Valdez's Report and Recommendation contains any mention of Plaintiffs' second, third, or fourth objections. The objections are therefore waived and, furthermore, are without merit. Plaintiffs' second objection—that the October 2 Settlement is patently inequitable and unfair—inexplicably argues that a district court must approve a settlement as fair, reasonable, and adequate pursuant to "Federal Rule of Civil Procedure 23(a)." (Dkt. No. 115 at 7.) The court assumes Plaintiffs intend to rely on Rule 23(e)—not 23(a)—which, of course, is limited to the types of actions stated in the title of Rule 23: "Class Actions."[7] *See, e.g.*, *In re Gen. Motors Corp. Engine Interchange Lit.*, 594 F.2d 1106, 1119 ("Ordinarily settlements of civil litigation are not reviewed by federal courts.") Plaintiffs' third objection raises concern with the absence of a provision "to carry out the transfer" of all AKT customers to Artuk. (Dkt. No. 115 at 9.) Notwithstanding the fact that the October 2 Settlement does not provide for the transfer of *every* AKT customer to Artuk, the absence of a provision "to carry out" the transfer is an immaterial logistical matter that will not scuttle a settlement. Plaintiffs' fourth objection—that Defendants' "unclean hands" should bar any

---

[7] Plaintiffs also cite a number of cases restating the requirements of Rule 23(e). (Dkt. No. 115 at 7.) All of these cases, unsurprisingly, concern the fairness of class action settlements.

equitable relief—is merely a recitation of the fraud allegations underlying the litigation and unrelated to the existence of an enforceable settlement agreement.

That leaves only Plaintiffs' first objection, which is that there was no "meeting of the minds" concerning the non-compete agreement. Judge Valdez, after considering the evidence presented at the multi-day evidentiary hearing she conducted, found otherwise based on Karayannis's testimony, the parties' representations to the court, and the parties' email correspondence as they reduced the oral October 2 Settlement to writing. (R&R at 16-19.) This court agrees with Judge Valdez's determination.

On October 2, 2013, the parties separately telephoned Judge Valdez to report that they had reached a settlement. (R&R at 6.) Karayannis testified that the settlement he reported to Judge Valdez—the October 2 Settlement—included an agreement to extend a three-year non-compete to five years. (Tr. at 360:20-25.) Karayannis similarly testified that as of October 2, his "understanding was that the global terms had been arrived at." (Tr. 374:10-12.) On October 7, 2014, Karayannis sent Malloy an email with five edits to the non-compete "paperwork" as it existed before the October 2 Settlement. (Dkt. No. 58 Ex. E at 1-3.) Karayannis described his edits as "the major changes everyone agreed to make to get this matter to its finish line." (*Id.* at 3.) On October 15, 2013, Malloy sent Karayannis a revised set of settlement documents, including the October 15 Non-Compete, that reflected Karayannis's edits as of that date. (Dkt. No. 34 Ex. B; Dkt. No. 58 Exs. B, C, D, F.) Karayannis responded the same day and promised to provide any comments or changes "ASAP." (Dkt. No. 34 Ex. C.) These emails, particularly Karayannis's, make clear that the October 2 Settlement included a "meeting of the minds" on the five-year non-compete. The emails between October 7 and October 15 do not even suggest that further negotiation took place; they merely reflect the minor back and forth between lawyers that

occurs whenever parties convert an oral agreement to writing. *See, e.g.*, *Abbot Labs* v. *Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999) ("As a general rule, anticipation of a more formal future writing does not nullify an otherwise binding agreement.") Accordingly, the court agrees with Judge Valdez's finding that the October 2 Settlement included a "meeting of the minds" on a five-year non-compete agreement, and that the terms of that oral agreement are reflected in the emails and drafts exchanged between Malloy and Karayannis, most recently in the October 15 Non-Compete (Dkt. No. 58 Ex. C).

Plaintiffs argue that there was no agreement because, as late as October 28, 2013, the parties were "still very far apart" on the terms of the non-compete. (Dkt. No. 115 at 3.) The parties' position on October 28 is irrelevant to any agreement reached on October 2. The only reason the parties were "far apart" on October 28 is because on October 25[8]—23 days after the parties reached an agreement—Schueler fired his attorney, pulled out of the settlement, and produced a revised non-compete that did not reflect the terms previously agreed to by the parties. In other words, Plaintiffs argue there was no "meeting of the minds" because they changed their minds after reaching an agreement. As the Seventh Circuit has made clear, however, "a party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement is insufficient." *Taylor* v. *Gordon Flesch Co., Inc.*, 793 F.2d 858, 863 (7th Cir. 1986).

II. <u>Karayannis's Affidavit</u>

Plaintiffs alternatively argue that Defendants knew by October 17, 2013 that the October 15 Non-Compete was "unacceptable." (Dkt. No. 115 at 3.) Although Plaintiffs' argument fails for the same reason as the previous one—the alleged abrogation occurred well after the parties

---

[8] October 25, 2013 is the date on which Boorstein filed an appearance (Dkt. No. 26) and the date on which Plaintiffs notified Defendants of the change in representation. As discussed below, the precise date of Karayannis's firing is the subject of some mystery.

reached an enforceable settlement on October 2—the source of Plaintiffs' argument is cause for concern. Plaintiffs rely on a sworn affidavit from Karayannis, which Plaintiffs submitted as Exhibit D to their objections to Judge Valdez's Report and Recommendation. (Dkt. No. 115 Ex. D.) Karayannis's affidavit, as discussed below, contradicts his sworn testimony before Judge Valdez, his own filings in this case, and the record of correspondence before the court.

### A. Contradictions in Paragraph 9 of Karayannis's Affidavit

Karayannis's affidavit states:

> After Mr. Schueler reviewed Mr. Malloy's draft of the [October 15 Non-Compete], he advised me that he was dissatisfied with the version of the Non-Competition Agreement Mr. Malloy had submitted because he believed it did not provide sufficient protection for him or Artuk.

(Dkt. No. 115 Ex. D ¶ 9.) This statement in Karayannis's affidavit directly contradicts Karayannis's and Schueler's testimony before Judge Valdez. On cross examination, Karayannis testified that he did not review the October 15 Non-Compete closely (Tr. 385:7-8) and that he had no substantive discussions with Schueler about the October 15 Non-Compete (Tr. 388:5-8). On redirect examination, Karayannis went even further by explicitly denying that Schueler ever told him the October 15 Non-Compete was unacceptable:

> Boorstein: Did [Schueler] specifically tell you [the October 15 Non-Compete] was unacceptable?
>
> Karayannis: . . . October 16th is the day I was told that you were taking over, so I never had that conversation with Mr. Schueler.

(Tr. 395:3-11.) Schueler likewise testified that he did not even read the October 15 Non-Compete, and was "not focused at all" on the October 15 Non-Compete, because he "wanted nothing to do" with the settlement by mid-October. (Tr. 310:11-312:5.)

B. <u>Contradictions in Paragraph 12 of Karayannis's Affidavit</u>

Karayannis's affidavit states:

> Within two days of my October 15, 2013 telephone conversation with Mr. Malloy, I informed Mr. Malloy: that the proposed version of the Non-Competition Agreement he had submitted was not acceptable; that Schueler had retained Mr. Boorstein to represent him in respect both to preparation of an acceptable Non-Competition Agreement and any further negotiations or proceedings in the Litigation.

(Dkt. No. 115 Ex. D ¶ 12.) This statement also appears to be false. Karayannis not only testified before Judge Valdez that Schueler fired Karayannis on October 16, 2013, but that Schueler told Karayannis to stop communicating with Malloy—an order that Karayannis obeyed "other than some perfunctory stuff."[9] (Tr. 386:10-12.) On October 21, 2013, after Karayannis did not fulfill his October 15 promise to send Malloy his comments on the settlement documents "ASAP," Malloy sent Karayannis an email asking "[w]here are we at on the status of the settlement documents?" (Dkt. No. 34-4.) And on October 24, 2013, Malloy sent another email stating: "A follow up. I still have not heard anything from you regarding the closing documents we sent to you for review. As I said, they incorporated everything you asked, so I assume they are ok with you." (Dkt. No. 34-5.) The correspondence record in this case reveals that Malloy was blindsided when, on October 25 at 2:54 p.m., he received a call from Boorstein stating that he was replacing Karayannis and had an issue with one area of the closing documents. (Dkt. No. 34-6.)

---

[9] The court assumes that Karayannis received the stop work directive from his client after he and Malloy jointly called the court on October 16 to postpone the October 17 status hearing (in anticipation of an October 31 closing date). (Dkt. No. 25.) Karayannis's motion to withdraw states that he was advised of his firing and instructed not to have contact with Malloy on October 17 or 18. (Dkt. No. 35 ¶ 8.)

- 14 -

C. Contradictions in Paragraph 13 of Karayannis's Affidavit

Finally, Karayannis's affidavit states:

> During an evidentiary hearing in the Litigation on April 7, 2014 I testified that I had advised Mr. Malloy on October 16 or 17, 2013 that Schueler would not agree to the version of [the] Non-Competition Agreement Mr. Malloy had prepared and that Mr. Boorstein would advise him about the necessary changes in the Non-Competition Agreement.

(Dkt. No. 115 Ex. D ¶ 13.) The court has carefully reviewed the transcript of Karayannis's testimony on April 7, 2014 and is unable to locate the testimony Karayannis swears he gave. (Tr. 356-424.) In fact, the emails Plaintiffs filed with Karayannis's affidavit indicate that Karayannis did not communicate with Malloy at all between October 15, when he promised to get Malloy comments "ASAP," and October 25, when Karayannis finally ended his period of non-communication and emailed Malloy to advise him that Boorstein would address the settlement paperwork on behalf of Schueler. (Dkt. No. 115 Ex. D at 10.)

Defendants urge the court to ignore Karayannis's affidavit under the "sham affidavit" rule. (Dkt. No. 116 at 12.) Although the court understands the reasoning behind Defendants' questioning the veracity of Karayannis's affidavit, the court need not make a determination under the sham affidavit rule, which is normally reserved for summary judgment proceedings. Plaintiffs intend the statements in Karayannis's affidavit to support their argument that the October 2 Settlement is unenforceable because Plaintiffs communicated their rejection by October 17, 2013. As discussed above, however, a party cannot pull out of a valid settlement merely because that party later decides it is insufficient. *Taylor* 793 F.2d at 863. Whether Karayannis informed Malloy of Schueler's reversal on October 17 is irrelevant to the court's assessment of a settlement agreement reached two weeks earlier. Whether Plaintiffs and Karayannis misrepresented or fabricated facts to support their frivolous argument is

unquestionably a matter of concern, but it is not at issue in this motion. *See* Fed. R. Civ. P. 11(c)(2).

III. Other Pending Motions

On September 27, 2013, Defendants filed a motion for an Order on Motion to Appoint Receiver and Motion for Preliminary Injunction and for Attorneys' Fees and Costs, alleging that Schueler is undermining Schoenecker's decision-making power as a partner in Artuk. (Dkt. No. 32.) On May 1, 2014, Plaintiffs filed a Motion for an Accounting and Turnover Order, requesting that Schoenecker account for and deliver to Schueler all monies that he allegedly withheld from Artuk. (Dkt. No. 98.) Plaintiffs' motion requests relief that is nearly identical to that requested in Plaintiffs' original complaint. (Dkt. No. 1.) As Judge Valdez noted, a ruling in favor of enforcing the settlement agreement moots both motions. (R&R at 5 n.1, 17 n.3.) Upon selling his stake in Artuk to Schueler, Schoenecker's issue concerning control of Artuk will be irrelevant and Schueler will have forfeited all claims associated with this lawsuit, including the redundant claims asserted in his motion for a turnover order. Both motions are therefore moot.

IV. Post-Settlement Conduct

Since the October 2 Settlement, the parties continue to lob allegations of fraud and improper dealing. Plaintiffs have raised concerns—in their objections to Judge Valdez's Report and Recommendation and in other filings—that Defendants are improperly serving Artuk customers in violation of the non-compete (which Schueler disavows) and that Defendants continue to improperly divert Artuk business to AKT. Defendants have reliably filed affidavits, as recently as August 4, 2014, disavowing Plaintiffs' allegations as meritless. (*See, e.g.*, Dkt. Nos. 118, 120.) As Judge Valdez advised the parties during the evidentiary hearing and in her Report and Recommendation, to the extent the various allegations concern conduct alleged in the

original complaint (Dkt. No. 1), the claims are foreclosed by the October 2 Settlement; to the extent they concern the non-compete agreement or any other provision of the October 2 Settlement governing the division of customers, the parties' remedy is to sue for violation of the October 2 Settlement.

## CONCLUSION

For the reasons set forth above, the court overrules Plaintiffs' objections and adopts in full Magistrate Judge Valdez's thorough and well-reasoned June 6, 2014 Report and Recommendation [114]. Accordingly, Defendants' amended motion to enforce the settlement agreement [31] is granted. The parties are ordered to fulfill their obligations under the October 2, 2013 settlement agreement, which include the following: (1) Schueler shall purchase Schoenecker's stake in Artuk for the price of $600,000; (2) Artuk shall retain Schoenecker as a consultant for six months from the date of Schueler's purchase of Artuk and Artuk shall pay Schoenecker $50,000 for his consulting services; (3) the parties shall enter into a five-year non-compete agreement consistent with the terms reached by email correspondence between Mark Malloy and Marios Karayannis from October 2, 2013 to October 15, 2013; and (4) the parties shall release any and all claims associated with this lawsuit. Defendants' motion to appoint receiver and motion for preliminary injunction and for attorneys' fees and costs [32] and Plaintiffs' motion for an accounting and turnover order [98] are denied as moot. This case was resolved by the October 2, 2013 settlement agreement and is dismissed pursuant thereto. Civil case terminated.

ENTER:

_James F. Holderman_
JAMES F. HOLDERMAN
District Judge, United States District Court

Date: August 7, 2014